UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
KAYHEEM LILLY,                                       )
                                                     )
                              Plaintiff,             )
                                                     )
        -against-                                    )
                                                     )
THE CITY OF NEW YORK; NYPD DETECTIVE )               **16 Civ. 322 (ER)**
MALCOLM FREEMAN, Shield No. 7049; NYPD )
POLICE OFFICER SOUL KIM, Shield No. 10804; )
NYPD POLICE OFFICER ANDREW HONG;        )
NYPD POLICE SERGEANT DONALD              )
CAMBRIDGE; NYPD DETECTIVE JORGE          )
TAJEDA; NYPD DETECTIVE FRANK             )
BATISTA; NYPD SERGEANT KEVIN             )
WHETSTONE; JOHN DOE SERGEANT; JOHN       )
DOES; and RICHARD ROES,                  )
                                                     )
                              Defendants.             )
-----------------------------------------------------------------X

DECLARATION OF JEFFREY A. ROTHMAN IN SUPPORT OF
MOTION FOR ATTORNEY'S FEES AND OTHER DISCRETIONARY
COSTS PURSUANT TO 42 U.S.C. § 1988 AND FED.R.CIV.P. 54(d)(2)

        JEFFREY A. ROTHMAN, declares, pursuant to 28 U.S.C. § 1746 and under

penalty of perjury, as follows:

        1.      I represent the plaintiff in this action.  As such, I am familiar with the facts

and circumstances concerning the prosecution of this action.  I respectfully submit this

declaration in support of plaintiff's application, pursuant to 42 U.S.C. § 1988 and

Fed.R.Civ.P. 54(d), for an order awarding plaintiff attorneys' fees and costs as the

prevailing party in this litigation.

        2.      This case stems from two separate incidents: one occurring on October 4,

2014, when Plaintiff alleged that he was, *inter alia*, falsely arrested and subjected to

excessive force by members of the NYPD outside of a strip club in the Bronx; and the other occurring on October 17, 2014 when Plaintiff alleges that he was, *inter alia*, illegally stopped, detained and issued summonses by other members of the NYPD.  The parties in this case completed the discovery required by the SDNY's "Plan" for cases against members of the New York City Police Department, and a mediation was held in person on September 19, 2016, with mediation efforts finally ending, without a settlement having been reached, on October 25, 2016.  On October 26, 2016 Defendants made their Offer of Judgment Pursuant to Fed.R.Civ.P. 68, which Plaintiff accepted on October 27, 2016.  *See*, Judgment Pursuant to Rule 68 at docket # 22 (which has the Rule 68 Offer, and the acceptance thereto, annexed to it).

   3.  I thereafter, on October 31, 2016, sent my time and expense sheets to opposing counsel, Elissa Fudim, Esq., and attempted to negotiate a settlement concerning the attorney's fees and costs that would allow the parties and the Court to avoid the necessity of the instant attorney's fees and costs application.  *See*, **Exhibit A** hereto (my 10/31/16 letter to Ms. Fudim, and my time and expenses sheets to the date of the Rule 68 Offer, 10/26/16, that were provided to Ms. Fudim along with that letter).  Those negotiations were unsuccessful, and opposing counsel's conduct has been in bad faith.

   4.  The Rule 68 Offer in this case was for $10,001, plus reasonable attorneys' fees, expenses, and costs to the date of the offer for plaintiff's federal claims.  On November 10, 2016 opposing counsel offered to pay, as a *global* settlement (i.e., *including* the $10,001 that is already owed to Plaintiff pursuant to the Rule 68 Judgment),

$18,000 (thus, $7,999 in attorney's fees and costs).  As set forth in **Exhibit A** my fees lodestar to the date of the Offer was $30,180, plus my costs of $467.  Opposing counsel's offer of $7,532 in attorney's fees (her $7,999 offer for both attorney's fees and costs, minus my $467 in costs) would pay me only 25% of my fees lodestar (i.e., would cut my fees by 75%).  This was entirely in bad faith.

5.      Upon receiving that November 10, 2016 offer I misunderstood it, and thought that Ms. Fudim had been offering me $18,000 for just the attorney's fees and costs (for this is how I have negotiated attorney's fees and costs in all other instances - of which there have been many - with the Law Department following the acceptance of a Rule 68 Offer.  This number still would not have been acceptable, as that would have been only 58% of my fees (a 42% cut), but it left open the potentiality of reaching a settlement of the attorney's fees and costs, and so I wrote the Court and received additional time to make Plaintiff's attorney's fees and costs application (*see*, Order dated November 14, 2016, at docket # 24, extending Plaintiff's time to file the attorney's fees and costs application to today, November 29, 2016), and made a counter-demand for my attorney's fees and costs wherein I agreed to reduce my fees by 10% (to $27,162), plus the costs of $467, for a total of $27,629.  Had I understood that the $18,000 offer included the $10,001 already owed to Plaintiff pursuant to the Rule 68 Offer, I never would have asked the Court for more time.  I simply would have made the attorney's fees and costs application.

6.     I have received no subsequent offer from Ms. Fudim, but earlier today received an email stating as follows:

> Our $18,000 offer was a global. Not an offer on your fees[1]. I have put in a request to see if we want to up our offer. I am still awaiting confirmation from the comptroller, but I believe our number will be $25,000 total (inclusive of the 68 and fees). If that won't do it, then you should file your motion. If that might do it, then hold off, and hopefully I'll get the final OK from the comptroller later today.

7.     This (potential) $25,000 "global" offer is still in manifest bad faith.  That would be only $14,532 in attorney's fees, which is only 48% of my attorney's fees lodestar (a 52% reduction to my attorney's fees).

8.     There is no possible justification, under any analysis of the time records that I have provided to Ms. Fudim, for her to ask me to take more than a haircut reduction to my lodestar in order to settle the attorney's fees and costs.  As explained below, and in the Memorandum of Law accompanying the instant application, my hourly rate is reasonable, and the time spent litigating this matter was reasonable.

9.     After twelve years of operating a solo civil rights practice, and litigating primarily against the New York City Law Department, I have been in a position (either after acceptance of a Rule 68 offer, or after trial) where I could have made numerous fee applications to the Court.  In only two instances in the past, however, have I been unable

---

[1] This was the first time I understood that by "global" Ms. Fudim meant that this $18,000 included the $10,001 already owed to Plaintiff pursuant to the Rule 68 Offer.  I had thought that "global" meant, in this context, that it included both the attorney's fees and the costs as well (as that is how I have negotiated all other attorney's fees and costs in the context of accepted Rule 68 Offers, in the numerous negotiations I have had with the Law Department in this regard).

to reach a settlement concerning fees and costs with the Law Department (and in one of those two instances the fees and costs were settled via a settlement conference with the assigned Magistrate Judge after the fees and costs application was filed). I have always been willing to – and remain willing to – accept a reasonable reduction in my fees and costs in order to avoid taking the Court's time, and my own time, with the filing of a formal fee application. I always much prefer to be spending my time working on litigating the substance of my clients' cases, rather than briefing fee applications.

10.     In this case, however, I am forced to file a formal fee application because the Law Department's position on my requested attorney's fees is so much more dramatically extreme and intractable than they to my recollection have been in past cases. Unfortunately, my attempt to reach a good faith resolution of the attorney's fees and costs in this case has been met with by the Law Department's insistence that I take a drastically large reduction in my lodestar.

11.     It is respectfully requested that the Court award me my full requested lodestar in this case, plus payment for the work that was unfortunately necessary to prepare the instant application. I have developed significant expertise in the field of constitutional litigation (and, in particular, in litigation stemming from police misconduct), my hourly rate is reasonable, and each minute spent on this case was reasonably calculated to advancing the case.

## ATTORNEY BACKGROUND AND EXPERIENCE

12.     I am a solo practitioner, concentrating in the area of civil rights litigation. The majority of my cases involve police misconduct by the New York City Police Department.  My office is located at 315 Broadway, Suite 200, New York, NY 10007.  I have operated my own solo civil rights practice since 2004.  Prior to that I worked for a year in New York City for Michael Spiegel, Esq., also doing primarily civil rights litigation, and criminal defense work.  Prior to that I worked for the Defender Association of Philadelphia, representing indigent defendants in criminal cases.  I graduated from the University of Pennsylvania Law School in 2001, where I was a research assistant for Professor David Rudovsky, one of leading civil rights practitioners in the country and a co-author of Michael Avery, David Rudovsky & Karen Blum, *Police Misconduct: Law & Litigation*, one of the leading treatises in the field.  During my second summer of law school, in 2000, I worked as a summer associate for the Law Office of Ronald L. Kuby, assisting primarily with police misconduct matters.  *See*, Declaration of Ronald L. Kuby, annexed hereto as **Exhibit 2.**

13.     I am a member of the bars of the State of New York, the State of Pennsylvania (inactive status), the United States District Courts for the Southern, Eastern, and Northern Districts of New York, and the United States Court of Appeals for the Second Circuit.

14.     I am or have been counsel for the plaintiff or plaintiffs in 167 civil rights cases in this district alone.  When potential plaintiffs come to me with civil rights matters raising complex issues or difficult facts that would deter many lawyers from accepting the case, but where I believe that there has been a deprivation of rights in need of redress, I will in many circumstances take the case where other lawyers might decline.  This has led me to become involved in governmental misconduct cases involving significant complexity and difficulty, through which I have developed considerable sophistication and skill in the field of civil rights litigation.  A decision in one of my cases, Forbes v. City of New York, et al., 05 Civ. 7331 (NRB), 2008 WL 3539936 (2008), addressing the issue of state action by private parties, was discussed in the New York Law Journal as one of two significant, then-recent cases that "illustrate a significant option for enforcing constitutional rights against nongovernmental actors."  *Applying Constitutional Obligations To Private Actors*, by Christopher Dunn, Esq., 4/28/2009 N.Y.L.J. at page 3 (2009).  That action settled on confidential terms.

15.     I was one of the lead attorneys in the complex consolidated litigation stemming from the mass arrests by the NYPD during the demonstrations surrounding the 2004 Republican National Convention (RNC), that has generated a number of important decisions in the police misconduct field, and which web of related and consolidated cases were litigated before Judge Karas, Judge Sullivan, and Magistrate Judge Francis for a decade.  *See, e.g.,* Dinler v. City of New York, et al., 2012 U.S.Dist.Lexis 141851 (denying City's motion for summary judgment as to one mass arrest location, and

granting Plaintiffs' motion for summary judgment as to another mass arrest location). An $18 million settlement was reached in the consolidated RNC litigations in 2014, which was then (and perhaps still is) the largest settlement stemming from mass demonstration-related arrests in U.S. history. *See also*, the Declaration of James I. Meyerson, annexed hereto as **Exhibit 3**, and the Declaration of Jonathan Moore, annexed hereto as **Exhibit 4**.

16.     Mr. Moore's Declaration also discusses our work together in the putative class action <u>Mitchell v. City of New York</u> (stemming from a mass arrest of partygoers by members of the NYPD), which at the time of his Declaration was still *sub judice* before the Second Circuit following my oral argument in February of 2015. Since that time[2], on October 28, 2016, the Second Circuit reversed the grant of summary judgment in Defendants' favor as to Plaintiff's main claim in that case (false arrest). *See*, <u>Mitchell v. City of New York</u>, 2016 U.S. App. LEXIS 19447 (2d Cir. Oct. 28, 2016). My co-counsel and I have just recently filed a Petition for Rehearing / Rehearing En Banc in that case, to ask the full Second Circuit to address for the first time an issue that has divided a number of its sister circuits: whether malice need be shown for a federal malicious prosecution claim (since that claim is brought under the Fourth Amendment, which is based upon a standard of objective reasonableness). That matter remains *sub judice*.

---

[2] My colleagues' Declarations in support that are submitted as **Exhibits 2-5** hereto were provided to me in late October, 2016 in connection with an anticipated attorney's fees and costs application in another case. A settlement in principle has been reached in that matter, and my colleagues have all authorized me to use those Declarations in the instant case, rather than asking them to sign new Declarations. I have replaced the caption with the caption in this case, and have not made any substantive changes to their Declarations in support.

17.     I also heavily litigated, as lead counsel, a putative class action against the New York State Division of Parole (DOP) and the New York State Department of Correctional Services (DOCS) on behalf of a putative class of returned parole violators whose concurrent sentences were unconstitutionally transformed into consecutive sentences, resulting in their being held past their lawful maximum expiration dates in prison.  That action has generated two important decisions holding that DOP's and DOCS' policies and practices violated the constitutional rights of thousands of returned parole violators.  *See*, e.g., <u>Sudler v. Goord / Batthany v. Horn</u>, 2010 WL 4273277 (S.D.N.Y. October 6, 2010) (Peck, M.J.); *See also*, <u>Sudler v. Goord / Batthany v. Horn</u>, 2011 WL 691239 (S.D.N.Y. February 23, 2011) (Daniels, J.).  Unfortunately, it was also held that because the law was not clearly established at the time the violations of the constitution occurred, the individual defendants were shielded from liability by the doctrine of qualified immunity.  The Second Circuit upheld the qualified immunity holding – *see*, <u>Sudler v. City of New York</u>, 689 F.3d 159 (2d Cir. 2012) - and the United States Supreme Court declined to grant certiorari.  Those matters were thereafter settled in the New York State Court of Claims.  *See also*, the Declaration of Matthew D. Brinkerhoff, Esq., annexed hereto as **Exhibit 5**.  These cases illustrate the particular risks that are present in civil rights litigation, where the doctrine of qualified immunity can prevent a recovery (either for a plaintiff, or fee and cost shifting for his or her attorney under 42 U.S.C. § 1988) even in circumstances where a constitutional violation has been proved.  The combination of the qualified immunity defense and the difficulties of proving municipal policy and practice liability pursuant to the <u>Monell</u> doctrine make civil rights cases, such as this one, inherently risky and difficult endeavors.

18.     Because many civil rights cases also have political implications, they are also often defended vigorously by government attorneys such as those in the New York City Law Department.  In _Bradley v. City of New York_, 04 Civ. 8411 (RWS), a case arising out of the arrest of a protestor at a 2003 anti-Iraq war protest by a member of the NYPD, it was necessary for my co-counsel, James I. Meyerson, and myself to try the case three times, in addition to fending off an interlocutory qualified immunity appeal to the Circuit.  The Bradley litigation generated multiple reported decisions, culminating in the securing of judgment as to liability as a matter of law in Plaintiff's favor.  S*ee*, _Bradley v. City of New York_, 2009 U.S.Dist.LEXIS 37664 (S.D.N.Y. 2009) (Sweet, J.).  Following victory in the Circuit on the interlocutory qualified immunity appeal, we were able to obtain at the damages trial an amount in excess of the amount offered by the Defendant City of New York in its Rule 68 Offer of Judgment.  The Plaintiff was awarded $20,000.00 and, in an eventual settlement of the fees and costs, Mr. Meyerson and I received the sum of $740,000.  *See*, the Declaration of James I. Meyerson, Esq., annexed hereto as **Exhibit 3.**

19.     In a number of the civil rights cases in which I have co-counsel (including some who have practiced for decades), I am lead counsel.  In these matters, my colleagues entrust me to serve as lead counsel because they know that I have attained considerable skill and experience in the field of governmental misconduct litigation, and that I approach these matters zealously and diligently.  *See*, e.g., the Declarations of Ronald Kuby, Esq. and Matthew D. Brinkerhoff, Esq., annexed hereto as **Exhibits 2 and 5**, respectively.

20.     Civil rights cases are all inherently risky endeavors, and involve arcane issues of law.  "Congress recognized that civil rights litigation is a specialized and complex field.  For this reason, the amount of the fees awarded in a civil rights case should be governed by 'the same standards which prevail in other types of equally complex federal litigation, such as antitrust cases'."   Michael Avery, David Rudovsky & Karen Blum, *Police Misconduct: Law & Litigation,* § 14:7 (3d ed.), quoting S. Rep. 6.

21.     As a result of this specialization, and the expertise I have developed in this field, I am routinely contacted by my colleagues seeking advice on how to prosecute civil rights cases, and police misconduct cases in particular.  I am an active member of the National Police Accountability Project (NPAP), an organization of over 500 plaintiffs' attorneys across the country who work on police misconduct and other civil rights cases, and which provides training and support for attorneys and other legal workers, as well as public education and information on issues related to police misconduct and accountability.  I have been a presenter at two Continuing Legal Education (CLE) programs sponsored by NPAP: on January 21, 2011, I was a presenter at an NPAP CLE as part of a panel presentation entitled "The Public as 'Client' in Police Misconduct Litigation," and I again presented at NPAP's CLE held on June 29, 2012, on the topic "Discovery Issues, including Electronic Discovery and Protective Orders."  I was also the moderator at a June 13, 2014 NPAP panel presentation entitled "Stop Guessing!  Legal Ethics for the Civil Rights Litigator."

22.     I am also a member of the Advisory Board of the New York City Policing Roundtable (NYCPR), a non-profit organization of over 70 members that nurtures

relationships between civil rights and public interest attorneys, community organizers, advocates, policy analysts, academics, and others who work to end police misconduct in New York City, and which has provided legal training and technical support, and advocated for systemic reforms.

23.     The people I represent in civil rights cases cannot afford the services of a lawyer on an hourly basis.  Almost none can make more than a small contribution to litigation expenses.  I take civil rights cases on a contingency basis, and I am compensated based on a portion of any judgment or settlement, or through the payment of fees by the defendants.

24.     Because the inherent risk in any civil rights case is high, and because of the risk that any civil rights case can become protracted with multiple, time and expense consuming layers of substantive and procedural complexity, civil rights lawyers like myself depend on the availability of a lodestar recovery in the event that we do prevail.

## HOURS EXPENDED AND APPLICABLE RATE

25.     I had, to the date of the issuance of Defendants' Rule 68 Offer (October 26, 2016), spent 50.3 hours of work on this matter[3].  At my hourly rate of $600 per hour, my lodestar to that date was $30,180, plus $467 in out-of-pocket costs.  *See*, the undersigned's time and expense sheets to the date of the Rule 68 Offer, annexed hereto as **Exhibit 1.**

---

[3] There are also, I am certain, a number of additional hours that I simply did not log in the midst of busy days, which I will not attempt to glean from contemporaneous notes in the file, and for which I am not seeking compensation.

26.     I have also needed to, today, spend an additional 6.5 hours of work on the instant attorney's fees and costs application[4].  At my hourly rate of $600 per hour, my lodestar for this additional necessary time is $3,900.  Although the terms of the accepted Rule 68 Offer purport to limit the recovery of attorney's fees for work done beyond the date of the Offer, in circumstances – like those at bar – where the Defendants have not negotiated the fees in good faith, thus necessitating the filing of a fee application, the award of fees for post-Offer time is certainly appropriate.  *See*, e.g., <u>Long v. City of N.Y.</u>, 2010 U.S. Dist. LEXIS 81020, at *5-6 (S.D.N.Y. Aug. 6, 2010):

> The Rule 68 judgment limited recoverable fees and expenses to those incurred prior to the date of the offer. If the City's dispute over recoverable fees were in bad faith, than compensation for the work necessary for plaintiffs fee application may be justified.

Other District Judges in this Circuit have similarly awarded attorney's fees despite the time limitation contained within the City of New York's Rule 68 Offers.  *See*, e.g., <u>Johnson v. City of N.Y.</u>, 2016 U.S. Dist. LEXIS 17088, at *18 (E.D.N.Y. Jan. 30, 2016):

> It is within a judge's discretion to award fees in connection with the fee application by an attorney seeking an award of attorney's fees. <u>Mawere v. Citco Fund. Servs.</u> (USA) Inc., No. 09-CV-1342, 2011 U.S. Dist. LEXIS 149111, 2011 WL 6779319, at *7 (S.D.N.Y Sept 16, 2011), adopted by 2011 U.S. Dist. LEXIS 148538, 2011 WL 6780909 (S.D.N.Y. Dec 27, 2011). The Second Circuit courts do not follow a uniform practice of awarding "fees on fees." Compare <u>Long v. City of New York</u>, No. 09-CV-6099, 2010 U.S. Dist. LEXIS 81020, at *5 (S.D.N.Y. Aug. 6, 2010) (denying a fee on fee award following a Rule 68 judgment) with <u>Rosado v. City of New York</u>, No. 11-CV-4285, 2012 U.S. Dist. LEXIS 35249, 2012 WL 955510, at *6 (S.D.N.Y. Mar. 15, 2012) (permitting recovery of reasonable fees, over objection, for preparing fee application following a Rule 68 judgment). This decision rests in the Court's evaluation of whether the incurred costs for the fee application were reasonable. See <u>Weyant v. Okst</u>, 198 F.3d 311, 316 (2d Cir. 1999) ("[A] reasonable fee

---

[4] I am not seeking compensation for the time I spent interacting with Ms. Fudim in trying to resolve this matter.

should be awarded for time reasonably spent in preparing an application for ... fees."); <u>Valley Disposal, Inc., v. Cent. Vt. Solid Waste Mgmt. Dist.</u>, 71 F.3d 1053, 1059 (2d Cir. 1995) (noting that a court should "evaluate the costs of preparing the [fee] motion no differently from the costs of litigating the underlying case.").

*See also*, <u>Charles v. City of N.Y.</u>, 2014 U.S. Dist. LEXIS 124056, at *20 (S.D.N.Y. Sep. 4, 2014), which awarded fees for the time spent in making an attorney's fees and costs application following acceptance of a Rule 68 Offer:

> The prevailing party in a civil rights case is generally entitled to fees incurred in connection with the preparation of a fee application. See <u>Tucker v. City of New York</u>, 704 F. Supp. 2d 347, 358 (S.D.N.Y. 2010) ("Time devoted to a fee application is generally compensable.") (collecting cases); see also <u>Barbour v. City of White Plains</u>, 788 F. Supp. 2d 216, 223 (S.D.N.Y. 2011) ("[T]he law . . . dictates that a prevailing civil rights plaintiff may include the costs of drafting a motion to recover fees as part of a fee award.").

27.     I thus request the following amounts be awarded by the Court for my work on this case to date:

| | | | |
|---|---|---|---|
| 50.3 hours to date of Rule 68 issuance X $600.00 per hour = | $30,160.00 | | |
| 6.5 hours for preparation of the instant attorney's fees and costs application X $600 per hour = | $3,900.00 | | |
| Rothman Expenses | $467.00 | | |
| **Total (to date) =** | **$34,527.00** | | |

28.     In addition to the fees and costs accrued to date, Plaintiff will supplement his request for fees and costs to reflect all work done on this fee and cost application along with the submission of his reply papers, once the amount of work expended on this matter is completed.

29.     I should therefore be awarded my full lodestar fees by this Court.  I worked diligently on this case, and developed it well and skillfully, which caused

Defendants to make the Rule 68 Offer that was accepted on October 27, 2016. The case involved, *inter alia*, investigating, and preparing a Complaint stemming from two separate incidents; addressing service issues and serving the multiple individual NYPD Officer Defendants; attempting to obtain, and reviewing, a number of medical records from multiple providers; dealing with Comptroller's office concerning the language in a settlement release (so that Plaintiff's claims in this case were not extinguished in an unrelated *pro se* settlement that Plaintiff reached with that office); engaging in this Court's Section 1983 "Plan" discovery; preparing an Amended Complaint based upon the discovery that was provided to me from Defendants as part of this Court's Section 1983 "Plan" (including investigating and incorporating into the Amended Complaint allegations concerning the NYPD's shady relationship with the strip club outside of which the first incident occurred); and engaging in this Court's Section 1983 "Plan" mediation. My time records are meticulously kept, and are annexed as **Exhibit 1** hereto. There is not any time that was spent on this case that was spent unreasonably.

30. I also made good-faith efforts to avoid the necessity of filing the instant fee application, but was unable to avoid doing so due to Defendants' bad faith and intractability. A reduction by the Court to my lodestar in this case would be unjust, and contrary to the principles underlying 42 U.S.C. § 1988. If the Court does deem some reduction to be proper, however, it should be at most "a haircut."

31. As referenced above, annexed hereto in support of my hourly rate are the following Declarations that were submitted by my colleagues: Declaration of Ronald L.

Kuby, annexed hereto as **Exhibit 2**; Declaration of James I. Meyerson, annexed hereto as **Exhibit 3**; Declaration of Jonathan Moore, annexed hereto as **Exhibit 4**; and the Declaration of Matthew D. Brinckerhoff, annexed hereto as **Exhibit 5**.

32.     In further support of my hourly rates, annexed hereto as **Exhibit 6** please find a chart with excerpts (listing only those firms that have New York as their largest U.S. office) from The National Law Journal's 2015 survey of "Billing Rates at the Nation's Priciest Law Firms.  Here are the 50 firms that charged the highest average hourly rates for partners."  (The survey is dated January 5, 2015).  The survey demonstrates that $600 per hour is well within the range of "prevailing market rates in the relevant community," <u>Perdue v. Kenny A.</u>, 130 S. Ct. 1662, 1672 (2010) (quoting <u>Blum v. Stenson</u>, 465 U.S. 886, 895 (1984)).  The "relevant community" in this case is the Southern District of New York[5].  The New York-headquartered firms listed list average partner rates from between $735 and $1,055 per hour.  These firms' highest billed associates bill from between $600 and $760 per hour.  I am the Principal of my solo law office, and the relevant comparator is the rates for partners.  Further, the National Law Journal survey does not cover all law firms, and it is well known among

_____

[5] Also of relevance, annexed hereto as **Exhibit 7** is a printout of the "Laffey Matrix" (www.laffeymatrix.com), which is an accepted tool for establishing hourly rates for attorneys in the Washington, D.C.-Baltimore area, and which has been used by Courts in a number of other venues as well.  *See*, e.g., <u>Interfaith Comm'ty Org. v. Honeywell</u>, 426 F.3d 694, 708-709 (3d Cir. 2005).  The Laffey Matrix lists the following current rates: $187 per hour for paralegals; $343 per hour for lawyers 1-3 years out of law school; $421 per hour for lawyers 4-7 years out of law school; $608 per hour for lawyers 8-10 years out of law school; $685 per hour for lawyers (such as myself) 11-19 years out of law school; and $826 per hour for lawyers with 20-plus years out of law school.

attorneys at law firms in New York that many of the firms with the highest rates do not respond to the survey.

33.     As I am a solo practitioner and often act as lead counsel, and take on myself the economic risk (in terms of the expenditure of both time and money) of civil rights cases, compared against these significantly higher rates enumerated above, my rates are certainly within a reasonable range of rates for lawyers of like skill and experience.  Judge Rakoff in 2008 noted, with reference to the then-current National Law Journal survey of rates, and to the experience garnered by solo practitioners, as follows:

> As to attorney's fees, defendants contend, *first,* that the billing rate of plaintiff's attorney, *i.e.,* $350/hour, exceeds the market rates "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." Gierlinger v. Gleason, 160 F.3d 858, 882 (2d Cir.1998) (internal quotation marks omitted). They argue instead that the proper rate should be, at most, $200/hour because plaintiff's counsel, having been admitted to the bar just five years ago, is comparable to a mid-level associate in a large law firm. However, this analysis ignores the considerable experience plaintiff's counsel has acquired as a solo practitioner, working primarily in the areas of wage and hour litigation over the past five years. Further, even assuming, *arguendo,* that defendants' comparison were here appropriate, a number of large New York firms bill the time of their fifth-year associates at between $300-$400/hour. *See* Billing Rates for Junior and Senior Associates, *The National Law Journal* (Dec.2004), *at* http://www.law.com/jsp/article.jsp?id=1102340171889. Accordingly, the Court finds the rate requested by plaintiff's counsel to be fully reasonable for counsel of his skill and experience.

Barfield v. New York City Health and Hospitals Corp., 2006 U.S. Dist. LEXIS 56711 at *1-2 (S.D.N.Y.) (Rakoff, J.), affirmed 537 F.3d 132, 139 (2nd Cir. 2008).

34.     Judge Rakoff also recently awarded me $550 an hour for my 2013 rates. *See*, June 16, 2016 (docketed on June 17, 2016) Memorandum Order in Bailey v. Pataki,

08 Civ. 8563 (JSR) and related cases (docket # 247) (annexed hereto as **Exhibit 8**).  In

footnote 3 on page 15 of that Memorandum Order in <u>Bailey</u> Judge Rakoff notes that the

$550 per hour that he deemed an appropriate rate for me represented my appropriate 2013

rate.  It is now 3 years later, of course, and my current rate is $600 per hour.

35.    Judge Rakoff was effusive in his praise for my, and my co-counsels',

abilities during the course of the eight year long, complex litigation in <u>Bailey</u>, and

following his close observation of our efforts during the course of a 3 ½ week long trial.

After explaining how our efforts in that case resulted in "ground-breaking conclusions of

law" (page 4 *et seq.*), Judge Rakoff later in his Memorandum Order described the skill

with which I litigated the case:

> Further still, another significant factor was plaintiffs' counsel's skill. In the
> Court's view, the plaintiffs' primary lawyers in this case, notably lawyers
> Benno, Rezvani, and Rothman, exhibited a very high level of skill, well
> beyond average. Against this background, the requested rates of most of
> plaintiffs' counsel are more than reasonable.
> ….
>
> [T]he requested rate of $550 is reasonable for Ameer Benno, Reza
> Rezvani, and Jeffrey Rothman, who jointly and severally undertook some
> of the key work in the case. Each has at least a decade of experience, and
> they have submitted declarations from other practitioners attesting that
> their requested rate is in keeping with the prevailing market rate…. They
> also submitted retainer agreements showing privately agreed upon rates of
> $550 for Benno and Rothman[6].

<u>Bailey</u> at 15-16.

36.    After determining that Mr. Benno and my appropriate 2013 hourly rates

were $550 per hour, Judge Rakoff then proceeded to reduce our lodestars in <u>Bailey</u> by

65% in light of the limited success ultimately obtained by the plaintiffs in that litigation

---

[6] Three recent retainer agreements showing my privately agreed upon rate of $600 per
hour are annexed hereto as **Exhibit 9**.

as to their damages: each of the six plaintiffs had only received from the jury nominal damages of $1 each, which Judge Rakoff ruled constituted limited success.  In the instant case, however, Plaintiff has received a significant sum of money - $10,001 - through the Rule 68 Offer of Judgment.

37.     One of the <u>Johnson</u> factors that Judge Rakoff discussed in his decision in <u>Bailey</u> was the "undesirability" of that case:

> Accordingly, to the extent that plaintiffs' counsel's rates are on the higher end of prevailing market rates for civil rights work - and the Court does not even think this is so - this is justified by the undesirability of the case.

<u>Bailey</u> at 14-15.

38.     The case at bar was also undesirable.  Plaintiff had sued members of the NYPD on multiple prior occasions, and had a complicated medical history and medical issues, that complicated issues concerning his damages in this case.  All of these are factors which tend to cause the City's Law Department to take a hard line in settlement negotiations.  The circumstances out of which this case arose (as to both of the incidents) also could arguable have offended a jury.  The first incident took place as Plaintiff was attempting to enter a strip club, and Plaintiff was cursing at the bouncer and had a marijuana cigarette in his boot.  *See*, Amended Complaint (docket # 13) at ¶¶ 11-13, 16, 26, and 32.  The second incident took place as Plaintiff was carrying a bottle of tequila. *See*, Amended Complaint (docket # 13) at ¶ 34.

39.     It was important to me to bring this case, however, since I was convinced that Mr. Lilly's rights had been violated, and that he had been treated cruelly and dishonestly by the Defendant members of the NYPD.

40.     I developed the case carefully and meticulously.  After the "Plan" mediation in this case ended without a settlement having been reached, because of my hard and diligent work the City's Law Department realized the Defendants' risk should the case proceed forward, and issued the Rule 68 Offer.

41.     Although the work expended in this case was done from 2015 (when my rate was $575 per hour) to 2016, I have billed for all of my time spent litigating this case at my current hourly rate.  *See,* LeBlanc-Steinberg v. Fletcher, 143 F.3d 748, 764 (2d Cir. 1998) ("Current rates, rather than historical rates, should be applied in order to compensate for the delay in payment."); Rozell v. Ross-Holst, 576 F. Supp.2d 527, 545 (S.D.N.Y. 2008) (Francis, M.J.) ("current rather than historic rates should be utilized to account for the delay between the date services were rendered and when fees can be recovered").


Dated:       New York, New York
             November 29, 2016


                                        Respectfully submitted,

                                        _____/S_____
                                        JEFFREY A. ROTHMAN, Esq.
                                        315 Broadway, Suite 200
                                        New York, NY 10007
                                        Tel.: 212 - 227 – 2980
                                         Attorney for Plaintiff