```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
KAYHEEM LILLY,                                    )
                                                  )
                        Plaintiff,                )
                                                  )
    -against-                                     )
                                                  )
THE CITY OF NEW YORK; NYPD DETECTIVE              )    16 Civ. 322 (ER)
MALCOLM FREEMAN, Shield No. 7049; NYPD            )
POLICE OFFICER SOUL KIM, Shield No. 10804;        )
NYPD POLICE OFFICER ANDREW HONG;                  )
NYPD POLICE SERGEANT DONALD                       )
CAMBRIDGE; NYPD DETECTIVE JORGE                   )
TAJEDA; NYPD DETECTIVE FRANK                      )
BATISTA; NYPD SERGEANT KEVIN                      )
WHETSTONE; JOHN DOE SERGEANT; JOHN                )
DOES; and RICHARD ROES,                           )
                                                  )
                        Defendants.               )
---------------------------------------------------------------X
```

REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
MOTION FOR ATTORNEY'S FEES
AND OTHER DISCRETIONARY COSTS PURSUANT TO
42 U.S.C. § 1988 AND FED.R.CIV.P. 54(d)

Plaintiff, by his attorney, respectfully submits this reply memorandum of law in further support of his Application for Attorneys' Fees and Other Discretionary Costs Pursuant To 42 U.S.C. § 1988 And Fed.R.Civ.P. 54(d).

Defendants' opposition brief, amazingly, makes no reference anywhere to Perdue v. Kenny A., 559 U.S. 542, 130 S. Ct. 1662 (2010), which "reaffirmed the utility of the lodestar approach to evaluate the reasonableness of fee applications in the § 1988 context." Barbour, et al. v. City of White Plains, 788 F.Supp.2d 216, 222 (S.D.N.Y. 2011). Defendants, in attacking Plaintiff's counsel's hourly rate of $600 per hour, rely primarily on Arbor Hill Concerned Citizens v. City. of Albany, 522 F.3d 182 (2d Cir. 2008) (and its reliance on a "presumptively reasonable fee" approach and the "Johnson factors" delineated in Johnson v. Georgia Highway Express, 488 F.2d 714, 717-19 (5th Cir. 1974)), and the recent decision by Judge Sweet in Schoolcraft v. City of New York, 2016 WL 4626568 (S.D.N.Y. Sept. 6, 2016). But the Supreme Court in Perdue has expressed its clear preference for the "lodestar" method over the Johnson method:

> One possible method [for determining a "reasonable" attorney's fee] was set out in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-719 (CA5 1974), which listed 12 factors that a court should consider in determining a reasonable fee. This method, however, "gave very little actual guidance to district courts. Setting attorney's fees by reference to a series of sometimes subjective factors placed unlimited discretion in trial judges and produced disparate results." Delaware Valley I, *supra*, at 563, 106 S. Ct. 3088, 92 L. Ed. 2d 439.
>
> An alternative, the lodestar approach, was pioneered by the Third Circuit in Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp., 487 F.2d 161 (1973), appeal after remand, 540 F.2d 102 (1976), and "achieved dominance in the federal courts" after our decision in Hensley. Gisbrecht v. Barnhart, 535 U.S. 789, 801, 122 S. Ct. 1817, 152 L. Ed. 2d 996 (2002). "Since that time, '[t]he "lodestar" figure has, as its name suggests, become the guiding light of our fee-shifting jurisprudence.'" Ibid. (quoting Dague, *supra*, at 562, 112 S. Ct. 2638, 120 L. Ed.2d 449).
>
> <u>Although the lodestar method is not perfect, it has several important virtues. First, in accordance with our understanding of the aim of fee-shifting statutes, the lodestar looks to "the prevailing market rates in the relevant community."</u> Blum v.

> Stenson, 465 U.S. 886, 895, 104 S. Ct. 1541, 79 L. Ed. 2d 891 (1984). Developed after the practice of hourly billing had become widespread, *see* Gisbrecht, *supra*, at 801, 122 S. Ct. 1817, 152 L. Ed. 2d 996, the lodestar method produces an award that roughly approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case. Second, the lodestar method is readily administrable, *see* Dague, *supra*, at 566, 112 S. Ct. 2638, 120 L. Ed.2d 449; see also Buckhannon Board & Care Home, Inc. v. West Virginia Dept. of Health and Human Resources, 532 U.S. 598, 609, 121 S. Ct. 1835, 149 L. Ed. 2d 855 (2001); and unlike the Johnson approach, the lodestar calculation is "objective," Hensley, *supra*, at 433, 103 S. Ct. 1933, 76 L. Ed. 2d 40, and thus cabins the discretion of trial judges, permits meaningful judicial review, and produces reasonably predictable results.

Perdue v Kenny A., 559 U.S. 542, 550-552 (2010) (emphasis added). The Court in Perdue made clear that "there is a strong presumption that the lodestar figure is reasonable." Id. at 554. Indeed, following the issuance of Perdue, many courts have questioned whether the Second Circuit's decision in Arbor Hill (which preceded Perdue, and which emphasized the Johnson factors) is still good law.[1]

The Court in Perdue also noted that it had previously "held that the novelty and complexity of a case generally may not be used as a ground for an enhancement because these factors presumably [are] fully reflected in the number of billable hours recorded by counsel." Perdue at 553 (internal citation omitted) (bracketing in original). Similarly, Defendants'

---

[1] *See*, e.g., Allende v. Unitech Design, Inc., 783 F. Supp. 2d 509, 514 n.4 (S.D.N.Y. 2011) ("The Supreme Court's Perdue opinion appears to cast doubt on the viability of the Second Circuit's 2008 opinion in Arbor Hill … which relied on among other factors, the Johnson factors."); Brig v. Port Auth. Trans Hudson, 2014 U.S. Dist. LEXIS 42538, at*4 (S.D.N.Y. Mar. 28, 2014) ("Although the Defendant has requested that the Court take into account the twelve factors outlined by the Fifth Circuit in Johnson ..., the discretionary methodology articulated in Johnson was rejected by the Supreme Court in Perdue, which endorsed the lodestar's more objective and predictable calculation."); Flores v. Mamma Lombardi's of Holbrook, Inc., 2015 U.S. Dist. LEXIS 65197, at *38 n.7 (E.D.N.Y. May 18, 2015) ("In embracing the lodestar approach, Perdue expressly rejected the twelve factor test set forth in Johnson ..."); Anthony v. Franklin First Fin., Ltd., 844 F. Supp. 2d 504, 507 n. 3 (S.D.N.Y. 2012) ("[T]here is some question as to whether the Supreme Court's Perdue opinion casts doubt on the viability of the Second Circuit's decision in Arbor Hill …").

3

arguments that the undersigned's hourly rate should be reduced because this was, in Defendants' counsel's view, a "garden variety false arrest and force case" (Defendants' brief at 6) - which is not, in any event, true, as explained in Plaintiff's moving papers - are meritless: as discussed below, the relative simplicity or complexity of the case and the tasks required to effectively litigate it are reflected in the undersigned's time records, and do not bear upon the propriety of the undersigned's hourly rate.

Judge Sweet's decision in Schoolcraft v. City of New York, 2016 WL 4626568 (S.D.N.Y. Sept. 6, 2016) (which was annexed as Exhibit C to Ms. Fudim's Declaration) – a District Court decision that is not binding upon this Court – is flawed, especially as concerns the issue of the attorneys' prevailing market rates. As an initial matter, the comparator rates that are used in the Schoolcraft opinion (*see* at *7) are from the *Eastern* District (where prevailing market rates are significantly lower), and not from the Southern District. *See*, e.g., Simmons v. N.Y.C. Trans. Auth., 575 F.3d 170 (2d Cir. 2009) (discussing the "forum rule" and that attorneys' hourly rates in the Southern District are significantly higher than in the Eastern District).

Opposing counsel's arguments - also based upon the Schoolcraft decision[2] - that the undersigned's hourly rate should be lower because I am a solo practitioner and have lower overhead than a large firm, have also been rejected by the Supreme Court. *See*, e.g., Missouri v Jenkins, 491 US 274, 285-286 (1989):

> In Blum v. Stenson, 465 U.S. 886 (1984), for example, we rejected an argument that attorney's fees for nonprofit legal service organizations should be based on cost. We said: "The statute and legislative history establish that 'reasonable fees' under § 1988 are to be calculated according to the prevailing market rates in the

---

[2] It must also be noted that there is a pending motion for reconsideration of the Schoolcraft decision, specifically as concerns its handling of the attorneys' hourly rates. *See*, 10 Civ. 6005 (RWS) at docket # 642.

4

relevant community . . . ." Id., at 895. See also, e. g., Delaware Valley, 483 U.S., at 732 (O'Connor, J., concurring) (controlling question concerning contingency enhancements is "how the market in a community compensates for contingency"); Rivera, 477 U.S., at 591 (Rehnquist, J., dissenting) (reasonableness of fee must be determined "in light of both the traditional billing practices in the profession, and the fundamental principle that the award of a 'reasonable' attorney's fee under § 1988 means a fee that would have been deemed reasonable if billed to affluent plaintiffs by their own attorneys"). A reasonable attorney's fee under § 1988 is one calculated on the basis of rates and practices prevailing in the relevant market, i.e., "in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation," Blum, supra, at 896, n. 11, and one that grants the successful civil rights plaintiff a "fully compensatory fee," Hensley v. Eckerhart, 461 U.S. 424, 435 (1983), comparable to what "is traditional with attorneys compensated by a feepaying client." S. Rep. No. 94-1011, p. 6 (1976).

(emphasis added). The argument also ignores that solo practitioners such as the undersigned often have wider and deeper experience in handling all aspects of their fields than do firm attorneys, owing to our being "chief cook and bottle washer" and handling all aspects of their cases, from meeting with the clients, through drafting the pleadings, through service of process, through discovery, through trial(s), and through any appeal(s). *See*, e.g., Barfield v. New York City Health and Hospitals Corp., 2006 U.S. Dist. LEXIS 56711 at *1-2 (S.D.N.Y.) (Rakoff, J.), affirmed 537 F.3d 132, 139 (2nd Cir. 2008) (which was cited in ¶ 33 of the 11/29/16 Rothman Declaration):

> As to attorney's fees, defendants contend, *first,* that the billing rate of plaintiff's attorney, *i.e.,* $350/hour, exceeds the market rates "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." Gierlinger v. Gleason, 160 F.3d 858, 882 (2d Cir.1998) (internal quotation marks omitted). They argue instead that the proper rate should be, at most, $200/hour because plaintiff's counsel, having been admitted to the bar just five years ago, is comparable to a mid-level associate in a large law firm. However, this analysis ignores the considerable experience plaintiff's counsel has acquired as a solo practitioner, working primarily in the areas of wage and hour litigation over the past five years. Further, even assuming, *arguendo,* that defendants' comparison were here appropriate, a number of large New York firms bill the time of their fifth-year associates at between $300-$400/hour. *See* Billing Rates for Junior and Senior Associates, *The National Law Journal* (Dec.2004), *at* http:// www.law.com/jsp/article.jsp?id=1102340171889. Accordingly, the Court finds the rate requested by plaintiff's counsel to be fully reasonable for counsel of his skill and experience.

Opposing counsel has also ignored entirely the Declarations that were submitted in support of the reasonableness of my hourly rate by the undersigned's highly experienced and respected colleagues Matthew D. Brinckerhoff, Ronald L. Kuby, James I. Meyerson, and Jonathan C. Moore that were annexed as **Exhibits 2-5** to the 11/29/16 Rothman Decl.  As opposing counsel has argued that, in her view, a reasonable paying client would not pay my $600 rate, I now add a fifth Declaration from another highly experienced and respected colleague, David A. Roth (annexed to the 1/20/17 Supplemental Rothman Decl. as **Exhibit 11**), who was one of my co-counsel in the Bailey v. Pataki litigation (in which Judge Rakoff awarded me fees at my 2013 requested rate of $550 per hour, and Mr. Roth at his 2013 requested rate of $600 per hour), and who, as set forth in his Declaration, in 2016 retained me to assist him with one of his cases at my requested rate of $600 per hour, paying me $9,420 for 15.7 hours of my work, and indicating that he would not hesitate to again retain my services at my current rate of $625 per hour[3].  The City also ignored completely my submission of an exemplary three retainer agreements with clients from 2016 (see **Exhibit 9** to the 11/29/16 Rothman Decl), in which my clients agreed, in the event I should need to seek *quantum meruit*, to my rate of $600 per hour.

Opposing counsel has further ignored completely the Laffey Matrix that was annexed as **Exhibit 7** to the 11/29/16 Rothman Decl.  As is clearly indicated in the Laffey Matrix - and which every attorney who has every billed his time over any course of years knows and practices - attorneys' rates (like the prices of everything else) go up over time, primarily because an attorney's experience increases over time and he or she is able to handle matters with increasing levels of skill and efficiency.  Opposing counsel's argument that I should be awarded on the present application less than the $550 per hour that Judge Rakoff awarded me as my 2013 rate in

---

[3] I raised my rate from $600 per hour to $625 per hour on January 1, 2017.  *See*, ¶ 2 to the 1/20/17 Supplemental Rothman Decl.

Bailey v. Pataki makes no sense at all.[4] I have at this juncture been practicing for a decade and a half, and - as my five colleagues in their respective Declarations, and Judge Rakoff in his decision in Bailey v. Pataki, have all attested to - have developed significant skill and expertise in litigating civil rights cases. Indeed, the current billing rates of 27 law firms whose largest U.S. office is based in New York (see **Exhibit 6** to the 11/29/16 Rothman Decl.) demonstrates that my hourly rate is not excessive. Partners at those firms routinely bill at over $700, over $800, over $900, and over $1000 an hour, and those firms often even bill their associates' time at a greater rate than I am seeking. Opposing counsel also completely ignores that it was recently reported (as discussed in Plaintiff's 11/29/16 Memorandum of Law) in the New York Times that the City of NY is paying the firm Debevoise & Plimpton to represent the City in the investigation into possible corruption by the de Blasio administration, and that "[t]he costs are set out in the contract and are commensurate with rates charged by other top city firms: $850 an hour for work by partners, $650 an hour for counsel, $575 an hour for associates and $175 for paralegals and other staff." See November 20, 2016 article by J. David Goodman in the New York Times, "$10 Million Contract Details Cost of Defending Mayor de Blasio in Inquiry," viewable at

http://www.nytimes.com/2016/11/21/nyregion/10-million-contract-details-cost-of-defending-mayor-de-blasio-in-inquiry.html?emc=eta1&_r=0 .

Defendants also attempt to argue that Plaintiff achieved only limited success. This contention is meritless. Defendants made a Rule 68 Offer of a sizable sum ($10,001 - an amount that Defendants calculated that Plaintiff may not have been able to surmount should he have

---

[4] Opposing counsel's arguments based on the erroneous Arbor Hill and Schoolcraft methodologies - that have been rejected by the Supreme Court's decision in Perdue - lead her to suggest to the Court that my 2016 hourly rate should be *reduced* from the $550 per hour rate (as of 2013) that I was awarded by Judge Rakoff in Bailey, to the $350 per hour rate that I was awarded in 2010 (for a fee application that was submitted in 2009) in Tucker v. City of New York, et al. There is no basis in either law or logic for a *reduction* of my hourly rate from what was awarded as my 2013 rate by Judge Rakoff.

prevailed at trial, otherwise the Rule 68 Offer would have been meaningless if it was not accepted - plus reasonable attorney's fees and costs). The reason a Rule 68 Offer is different than a regular settlement offer is, of course, that rejecting it (especially when it is made, as here, prior to the exchange of expensive and time-consuming discovery) and then possibly winning at trial but not surmounting the Rule 68 Offer amount has serious consequences: *i.e.*, the civil rights plaintiff in that circumstance must pay the defendants' costs from the date of the offer forward, and there is no reimbursement for either costs or attorney's fees for the civil rights plaintiff from the date of the Rule 68 Offer forward. Defendants have no legitimate basis upon which to contend that Plaintiff has not achieved a full measure of success.[5]

---

[5] Opposing counsel's conduct in informing the Court of the details of the Mediator's proposal procedure - including my supposedly (which is not, in any event, true) asking the Mediator to review medical records, and that the Defendants responded "yes" to the Mediator's proposal and Defendants' deduction that Plaintiff had responded "no" to same (see, Defendants' brief at 1-2, and 10) - that was employed as part of the confidential Local Rule 83.10 mediation proceedings is just outrageous, and should be sanctioned under the Court's inherent power. *See*, e.g., Chambers v NASCO, Inc., 501 U.S. 32, 35 (1991) (exploring the scope of the inherent power of a federal court to sanction a litigant for bad-faith conduct, and holding that a court may issue as a sanction for bad-faith conduct attorney's fees and related expenses); *see also*, Lake Utopia Paper, Ltd. v Connelly Containers, Inc., 608 F2d 928, 929 (2d Cir 1979) (noting that "[t]he inclusion of such information [the details of what transpired in a confidential Civil Appeals Management Plan conference] in a brief is highly improper and will not be condoned," and describing the deleterious effects to the Court of disclosing such confidential information); *see also*, Bernard v Galen Group, 901 F Supp 778, 783-784 (SDNY 1995) (Chin, J.) (holding that counsel had violated "the confidentiality provisions applicable to cases referred to the Mediation Program" and sanctioning counsel $2,500). All parties and the Mediator signed a Mediation Confidentiality Agreement (annexed hereto as **Exhibit 12** to the 1/20/17 Supplemental Rothman Decl.) (I have redacted the signatures of the Mediator and an observer Mediator-trainee). This Mediation Confidentiality Agreement states, in relevant part, as follows:

> 1. Any communications made during the mediation process shall be confidential ....
> 2. The parties may not disclose discussions with the mediator unless all parties agree, because it is required by law, or because otherwise confidential communications are relevant to a complaint against a mediator or the Mediation Program arising out of the mediation.
> 3. The mediation process shall be treated as a compromise negotiation for purposes of Rule 408 of the Federal Rules of Evidence and state rules of evidence.

Opposing counsel attempts to justify her clear and willful violation of the Mediation Confidentiality Agreement by criticizing the undersigned for informing the Court about the

In addition to attacking the undersigned's hourly rate, opposing counsel also attacks the amount of time that I spent on the case, and argues that since she spent X number of hours defending it, I should only have spent approximately X number of hours in bringing it and litigating it. There is, however, no logic in that. My time records are detailed and meticulous, and every bit of time spent developing this case – which involved two separate incidents brought in a single suit – and litigating it is accounted for and was reasonably spent at the time the work

---

amount of Defendants' offer to settle the attorneys' fees and costs to be paid in connection with the Rule 68 Judgment. But this is entirely distinguishable, as under some of the caselaw (e.g., Long v. City of N.Y., 2010 U.S. Dist. LEXIS 81020, at *5-6 (S.D.N.Y. Aug. 6, 2010), discussed in ¶26 of the 11/29/16 Rothman Decl.) it is necessary to demonstrate Defendants' bad faith in order to be paid for work on a fee application in light the language in the City's Rule 68 Offers, which purports to cut off fees as of the date of the Offer). It was thus necessary for me to inform the Court of the amount of Defendants' bad-faith offer to settle the fees. Defendants' substantive arguments concerning the Mediator's proposal, in addition to violating the confidentiality agreement, are also entirely meritless: Plaintiff declined the mediator's proposal because there were no potential penalties for having done so akin to those applicable under Rule 68. Opposing counsel has no basis for "assuming that [Plaintiff] and counsel [had] agreed to a standard two thirds / one third recovery split" (Defendants' opposition brief at 2) had the mediator's proposal been accepted, or for assuming that such a split would be "standard" in a fee-shifting civil rights case. Plaintiff also never knew until Defendants' opposition brief (and was never supposed to know under the blind procedure agreed upon between the parties and the Mediator for the Mediator's proposal) that the Defendants' response to it was "yes" (indeed, my 10/24/16 time entry was careful to not disclose this information, and states, "Email to mediator with P's <u>confidential</u> response to his proposal." (emphasis added)). Indeed, when the Rule 68 Offer was issued the Mediator's proposal procedures were entirely over and done with, and the Rule 68 Offer was evaluated - in terms of its satisfactory amount and the risks it carried by dint of it being a Rule 68 Offer, and also in terms of it resulting in a Judgment (with a release of liability as to only this case, and not with a release of liability "from the beginning of the world" as is required with the City's standard settlement paperwork) - and Plaintiff decided based on those various considerations that the Rule 68 Offer ought to be accepted. Defendants issued their Rule 68 Offer because they feared losing this case (likely, in significant part, due to the undersigned's skills and experience in being able to litigate it to a successful conclusion), and they issued it for an amount that they thought had a significant chance of Plaintiff not being able to surmount should he prevail at the trial of this action (otherwise it would be meaningless). Defendants cannot now claim that by folding (by issuing the Rule 68 Offer, which Plaintiff decided he wished to accept) Plaintiff has somehow achieved less than a full measure of success.

I will be providing a copy of the briefing in this matter to the Mediator, and to Rebecca Price, the Director of the SDNY's ADR [Alternative Dispute Resolution] Program, so that they are aware of opposing counsel's blatant and willful violation of the Mediation Confidentiality Agreement.

was done[6]. This is the standard. *See*, Moreno v. County of Sacramento, 534 F.3d 1106, 1112 (9th Cir. 2008), and Grant v. Martinez, 973 F.2d 96, 99 (2d Cir. 1992), which were both cited and quoted from in Plaintiff's moving brief.

Opposing counsel also attacks the time spent on the fee application. I submit that the 6.5 hours spent on Plaintiff's moving papers - which included a highly detailed and case-specific Declaration from the undersigned, with nine supporting exhibits - was entirely reasonable, and demonstrates the undersigned's efficiency. I of course had templates from prior fee applications (the last one having been submitted in 2013, in Bailey) to work with that saved me a not inconsiderable amount of time as compared with having to start from scratch, but it was necessary to spend the time that was spent in order to prepare Plaintiff's arguments and

---

[6] I have responded to opposing counsel's arguments concerning the time spent related to service of process in a ¶¶ 3-5 of the 1/20/17 Supplemental Rothman Decl. Concerning the emails that were annexed as Exhibit B to the 1/6/17 Fudim Declaration, opposing counsel appears to assume that when an attorney bills for an email, he or she may only properly bill for the time spent actually typing the email. There is, however (which should be obvious) more to it than that. The August 4, 2016 emails that opposing counsel complains are examples of my "inflated" (a word opposing counsel uses repeatedly in Defendants' opposition brief) overbilling involved making Plaintiff's demand, and filling out and providing medical releases, and witness information, and a cover letter to provide a hard copy of the medical release. The time noted in the undersigned's billing entries from that day (annexed as **Exhibit 1** to the 11/29/16 Rothman Decl.) is all appropriate, and the time spent doing these tasks took no longer than reasonably necessary. Opposing counsel also takes issue with the fact that I liased with medical providers to obtain medical records, and argues that Plaintiff himself should have done that. But it is a standard practice for an attorney to send medical releases to medical providers in order to obtain clients' medical records. Further, in the case at bar, Plaintiff only sought "garden-variety emotional distress" (Amended Complaint at ¶¶ 68, 71, 79, 82, 85, 88, 91, 94, 97, 100, 103, 106, 109, and 113), and I only sought from the medical providers - in order to protect Plaintiff - records relating to treatment for physical (and not mental health) treatment, and only for certain specific time periods. Opposing counsel overestimates the ability of laypeople (who sometimes have limited education and / or literacy, and sometimes have mental health issues and / or language barriers, or otherwise) to engage in such tasks, and provides no support for her claim that Plaintiff should have obtained his own medical records instead of my doing it for him through releases specifically tailored to the particularities and needs of the case at hand. Opposing counsel also complains on page 12 of Defendants' opposition brief about the time spent drafting the Amended Complaint. As with the emails, there is more to this than just the time it takes to physically type the words. As explained in ¶ 4 to the 1/20/17 Supplemental Rothman Decl., the Amended Complaint added a number of new Defendants based upon the discovery that had been provided. This involved reviewing the documents produced by Defendants carefully, so that the proper Defendants were added to the case in a responsible manner.

supporting materials in a way that was organized, up to date, and comprehensive. Concerning the issue of "fees on fees" for work on the fee application, I also note (in addition to the other authority provided along with Plaintiff's moving papers) that Judge Garaufis in the EDNY has just recently issued a decision awarding attorney's fees against the City for work on a fee application in the Rule 68 context. *See*, December 22, 2016 Memorandum & Order in <u>Adrian John, et al. v. Police Officer Matthew Demaio, et al.</u>, 15 Civ. 6094 (NGG) (CLP) (annexed as **Exhibit 13** to the 1/20/17 Supplemental Rothman Decl.).

I have, since the filing of the initial fees and costs application papers on November 29, 2016, had to spend an additional 11.5 hours on this case, as set forth in the further time sheets annexed as **Exhibit 14** to the 1/20/17 Supplemental Rothman Declaration.[7] It has taken me longer to prepare Plaintiff's reply papers than it did to prepare the initial motion papers, as replying to Defendants' arguments required legal research, and the drafting of a further Declaration and the compilation of further exhibits thereto.

Plaintiff thus respectfully seeks the following total amount on the instant attorney's fees and costs application:

| | | | |
|---|---|---|---|
| 50.3 hours to date of Rule 68 issuance X $600.00 per hour = | $30,160.00 | | |
| 6.5 hours for preparation of the instant attorney's fees and costs application X $600 per hour = | $3,900.00 | | |
| 11.5 hours for time spent post-November 29, 2016 fees and costs application through January 20, 2017 reply papers X $625 per hour | $7,187.00 | | |
| Expenses | $467.00 | | |
| **Total (to date) =** | **$41,714.00** | | |

---

[7] As explained in ¶ 2 to the 1/20/17 Supplemental Rothman Decl., I have raised my rate as of January 1, 2017 from $600 to $625 per hour. I am not, however, re-calculating at that rate any of the time previously submitted as part of the November 29, 2016 initial motion papers.

## **CONCLUSION**

For the foregoing reasons, Plaintiff's counsel should be awarded his requested fees and costs.

Dated:	New York, New York
	January 20, 2017

					Respectfully submitted,

					_____/S/_____
					JEFFREY A. ROTHMAN, Esq.
					315 Broadway, Suite 200
					New York, NY 10007
					Tel: 212 - 227 – 2980

					Attorney for Plaintiff